## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| Jodie C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:18-CV-1687-S-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Jodie C. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), and for supplemental security income (SSI) under Title XVI of the Act. (docs. 1; 18.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

On August 4, 2015, Plaintiff filed her applications for DIB and SSI alleging disability beginning on May 16, 2015.  (doc. 13-1 at 151, 279-80, 390.)[2]  Her claims were denied initially on October 21, 2015, and upon reconsideration on January 13, 2016.  (*Id*. at 305, 311, 321.)  On January 22, 2016, she requested a hearing before an Administrative Law Judge (ALJ).  (*Id*. at 325.)  She appeared and testified at a hearing on September 13, 2016.  (*Id*. at 200-15.)  On May 8, 2017,

---

[1]  By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]  Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

the ALJ issued a decision finding that she was not disabled, and denying her claims for benefits. (*Id*. at 151-60.)

Plaintiff appealed the ALJ's decision to the Appeals Council on July 6, 2017, and included new medical evidence. (*Id*. at 7, 379.) The Appeals Council determined that the new evidence did not provide a basis for changing the decision and denied her request for review on April 27, 2018, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 6-7.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* docs. 1; 18.)

A. **Age, Education, and Work Experience**

Plaintiff was born on June 20, 1968, and was 48 years old at the time of the hearing. (doc. 13-1 at 159, 202-03.) She had at least a high school education, could communicate in English, and had past relevant work experience as a housekeeper/cleaner, janitor, and cook. (*Id*. at 158-59.)

B. **Medical Evidence**

On January 12, 2012, Plaintiff presented to St. Luke's Hospital with complaints of right lower back pain that radiated to her right anterior thigh and down her entire right lower leg, as well as a burning sensation, but she had no numbness or tingling. (*Id*. at 514.) Her pain had been worsening over the previous few months, and she reported chronic pain since an injury that occurred about 8-10 years ago. (*Id*.) She intermittently had burning in her right leg, and sometimes in both of her feet. (*Id*.) Her physical exam showed some right-sided lumbar musculature pain, but she was able to stand and ambulate without any difficulty. (*Id*.) It was determined that she had acute chronic low back pain. (*Id*. at 515.)

On October 29, 2012, Plaintiff met with Donald J. Linder, D.O., with complaints of back pain. (*Id*. at 527-28.) The back pain was a chronic problem that had not changed since its onset, and

2

the current episode of pain started over one week before her appointment. (*Id.* at 527-28.) Plaintiff described the pain in her lumbar spine as shooting, radiating to the right thigh, and moderate, and she rated it at an 8 out of 10 on the pain scale. (*Id.*) The pain was the same all of the time, and associated symptoms included numbness and tingling. (*Id.*) She also had pain in both of her feet, which she described as sharp and at a severity of 6 out of 10. (*Id.*) Associated symptoms included numbness and tingling and were aggravated by standing, but she had full range of motion, no stiffness, and no itching. (*Id.*)

On January 16, 2014, Plaintiff went to Unity Point Family Medicine (Unity Point) to establish care. (*Id.* at 600.) She complained of herniated disc pain. (*Id.*) She reported back and feet issues, including pain in the right side of her back into her right leg and foot that also went into her left side. (*Id.*) She had to roll out of bed in the morning and had a hard time getting comfortable. (*Id.*) She reported a herniated disc and fasciitis in her feet. (*Id.*) She previously had physical therapy for her back but it did not help. (*Id.*) A physical exam of her lumbosacral spine was normal and her straight-leg raise test was negative. (*Id.* at 601.) Her sacroiliac joints showed tenderness on palpation and her foot exam was normal, except a plantar fasciitis test elicited pain in the heel of her right foot. (*Id.*) Her gait, stance, and heel and toe walking were normal. (*Id.*)

On February 12, 2014, Plaintiff saw Douglas T. Sedlacek, M.D., for pain in her lower back and down her leg. (*Id.* at 539.) Plaintiff reported that her legs would become numb if she sat for too long, and she rated her pain as an 8 out of 10. (*Id.*) Lying down and sitting were the best positions for her, while standing was the worst. (*Id.*) Bending, kneeling, and lifting off or too long bothered her, as did shoveling snow. (*Id.*) She took medication and had physical therapy without much improvement. (*Id.*) An MRI showed multilevel facet arthropathy with multiple neural

foraminal narrowing without focal nerve root compression, and an incomplete annular tear at the L4-L5 disc in the region of the neural foramen. (*Id*.) Plaintiff denied weakness, but had fatigue. (*Id*.) Her physical exam showed reasonable flexion in her back with some extension pain; although extension and lateral flexion caused pain, it was difficult to ascertain because it was inconsistent. (*Id*. at 540.) She did have consistent tenderness over her facets. (*Id*.) Her gait was normal but she had difficulty toe and heel walking secondary to plantar fasciitis. (*Id*.) Dr. Sedlacek's impression was status so far not improved following her injection for her right plantar fasciitis, long-standing low back pain, and bilateral leg pain of unknown etiology. (*Id*.)

On February 27, 2014, Plaintiff went to Unity Point for pain in her neck and shoulders. (*Id*. at 598.) She said she had tingling pain in her right arm that was getting worse, and her shoulder blades and neck were hurting. (*Id*.) A physical exam showed tenderness to palpation on the right of her C5 transverse process, right C6 transverse process, trapezius muscle, and paracervical muscles, and cervical spine pain was elicited by motion, but cervical spine motion was normal. (*Id*.) Her cervical spine exhibited a muscle spasm. (*Id*. at 599.)

On March 7, 2014, Dr. Sedlacek performed an inter-laminar epidural steroid block at L4-L5 under flouroscopic guidance with sedation on Plaintiff. (*Id*. at 541-42.) Her preoperative and postoperative diagnoses were long-standing low back pain in the setting of minimal bulging disc at L3-L4 and possible facet arthropathy at L4-L5 with non-focal exam. (*Id*. at 541.) He noted that nothing had really changed since her prior appointment on February 12, 2014. (*Id*. at 542.) Plaintiff tolerated the procedure well, and she was discharged to her room in stable condition. (*Id*.)

On March 17, 2014, Dr. Sedlacek called Plaintiff to follow-up after her epidural procedure. (*Id*. at 543.) Her pain was about 30% improved and she rated it at a 6 out of 10. (*Id*.) She was able

to walk a block further than before, and the numbness in her legs had improved.  (*Id*.)  Dr. Sedlacek noted that he would consider a repeat block to possibly obtain further improvement.  (*Id*.)

On March 9, 2014, Plaintiff presented to Unity Point for rechecks following injections in her back.  (*Id*. at 596.)  She reported that despite an epidural steroid injection in her back 2 weeks before, her neck and shoulder were still bothering her, and she had felt worse the previous couple of days.  (*Id*.)  She took Lortab and Flexeril, which helped a little bit, but since the injection in her back, the numbness in her legs had not gone away.  (*Id*.)  She still had problems sleeping and getting comfortable because of her lower back.  (*Id*.)  She had tenderness to palpation at her trapezius muscle and paracervical muscles, a muscle spasm in her cervical spine, and pain in her cervical spine from motion, but her cervical spine appeared normal, and its motion was normal.  (*Id*. at 597.)

On June 16, 2014, Plaintiff underwent bilateral facet joints at L4-L5 and L5-S1 under flouroscopic guidance with sedation.  (*Id*. at 544.)  Her preoperative and postoperative diagnoses was a bulging disc with possible annular tear at L4-L5 and low back pain, with a possible component of lumbosacral spondylosis.  (*Id*.)  She tolerated the procedure well and was discharged back to her room in stable condition.  (*Id*. at 545.)  On a follow-up call one week later, Plaintiff indicated that she was no better following the procedure.  (*Id*. at 546.)

On June 20, 2014, Plaintiff went to Unity Point following injections in her back with Dr. Sedlaceck; she  had bruising.  (*Id*. at 590.)  It was noted that she had more spasms than usual in her lower back muscles, but Plaintiff did not report any pain into her legs.  (*Id*.)  She was started on Cyclobenzaprine.  (*Id*.)

On August 20, 2014, August 29, 2014, and September 25, 2014, Plaintiff returned to Unity Point for follow-up appointments.  (*Id*. at 582-87.)  On August 20, 2014, she reported that she still

had back pain and it was getting worse, her fasciitis had returned in both feet, and Tramadol was not helping. (*Id*. at 586.) She could not sleep, and Flexeril helped, but she ran out. (*Id*.) Physical therapy was reportedly no help at all. (*Id*.) She exhibited tenderness on palpation to her lumbosacral spine. (*Id*. at 587.) She was assessed with low back pain, plantar fasciitis, and asthma. (*Id*.) She was put back on Hydrocodone, and Cyclobenzaprine was renewed. (*Id*.) On August 29, 2014, she reported that she had gone to a pain clinic and to physical therapy with no help, and that her pain medications were not helping. (*Id*. at 584.) Hydrocodone helped at first with Flexeril, but it was no longer helping. (*Id*.) She had lower left thigh pain into her entire left leg with walking, but less pain with sitting. (*Id*.) It was ordered that she stop taking Flexeril and begin taking Valium, her Hydrocodone dosage was increased, and she was switched to Hydrocodone/Ibuprofen. (*Id*. at 585.) On September 25, 2014, Plaintiff noted that Hydrocodone and Ibuprofen were helping more, but she was very tired. (*Id*. at 582.) Tenderness was noted in her lower back with palpation. (*Id*.)

On November 5, 2014, Plaintiff saw Dr. Sedlacek for back pain that went down to her left leg. (*Id*. at 546-47.) He noted that she had undergone interventions with some improvement. (*Id*. at 547.) She initially had an epidural injection, which helped her radicular symptoms, and she was still doing well. (*Id*.) She then had diagnostic facet joints, but the procedure was negative. (*Id*.) She complained mainly of back pain, and the pain was axial and across the lumbosacral junction, just below the shoulder blades. (*Id*.) Imaging showed low-grade L3 and L4 degenerative disc disease and a small left paracentral disc protrusion at the L4 interspace level without obvious nerve encroachment. (*Id*.) Her best position was lying down and the worst was standing, and sitting on something hard did not help. (*Id*.) A physical examination of her back showed reasonable flexion and extension, no deflexion pain, and extension and lateral flexion did not exacerbate her pain. (*Id*.

at 548.)   Her facets did not show any tenderness, and she had full strength in plantar flexion/extension, knee flexion/extension, and hip flexion.  (*Id*.)  Dr. Sedlacek noted that Plaintiff had essentially failed conservative treatment and interventional treatment, and she had axial low back pain as her biggest complaint with occasional radicular symptoms down the left side.  (*Id*.)  Mild degeneration was noted.  (*Id*.)

On November 24, 2014, Dr. Sedlacek performed a provocative discography low-pressure at L3-L4, L4-L5, and L5-S1 under flouroscopic guidance with sedation.  (*Id*. at 549.)  Plaintiff rated her pain as an 8 out of 10, and Dr. Sedlacek noted that her pain was usually between 5 and 10.  (*Id*.)  Her preoperative diagnosis was axial low back pain with left paracentral disc protrusion at L3-L4 and possible left radicular symptoms.  (*Id*.)  Her postoperative diagnoses were a small left paracentral disc protrusion at L3-L4 with history of left radicular symptoms and a negative provocative discography at L3-L4, L4-L5, and L5-S1.  (*Id*.)

On February 10, 2015, Plaintiff returned to Unity Point for worsening back pain, for which pain pills were ineffective.  (*Id*. at 572.)  She was moving out of her apartment and had been doing a lot of heavy lifting over the prior week.  (*Id*.)  She had problems with increasing amounts of pain, but stated that she had not had any problems with any sensation in her legs.  (*Id*.)  Her lumbar spine had increased amounts of paraspinal muscle tenderness and some spasms, but there were no obvious signs of any bony deformity or angulation.  (*Id*. at 573.)  Some pain was noted in both sacroiliac joints, but there were no obvious signs of any abnormal curvatures noted.  (*Id*.)  She was assessed with low back pain and instructed to stop taking Ibuprofen and start Meloxicam.  (*Id*.)

On June 2, 2015, x-rays of Plaintiff's lumbar spine showed mild degenerative disc disease at L3-L4 and L4-L5, no fractures or subluxations, and no lytic or blastic lesions.  (*Id*. at 614.)

On July 28, 2015, an MRI of Plaintiff's lumbar spine demonstrated 3mm disc bulges at L3-L4 and L4-L5, and mild bilateral facet arthrosis at L5-S1. (*Id*. at 619.) Her spinal canal was normal with no foraminal stenosis. (*Id*.)

On October 7, 2015, Plaintiff saw Louis Provenza, M.D., for low back pain that radiated to her right foot, which she described as aching and throbbing. (*Id*. at 638.) The severity of her back pain was at a 9 out of 10 and had been ongoing for the previous 3 years, and it was worsening and occurred persistently. (*Id*.) Her symptoms were aggravated by climbing stairs, bending, daily activities, lifting, lying/resting, rolling over in bed, standing, and walking, but her symptoms were relieved by pain medication. (*Id*.) Her physical exam showed tenderness in her lumbar spine and mild pain with motion. (*Id*. at 640.) Her gait, cervical spine, and thoracic spine were normal. (*Id*. at 641.) She was assessed with chronic back pain, other chronic pain, and a body mass index (BMI) of 31.0-31.9. (*Id*.)

On October 8, 2015, Plaintiff went to the North Central Texas Medical Foundation with hot flashes and low back pain. (*Id*. at 625.) The discomfort in her back was chronic and most prominent in the mid and lower lumbar spine and radiated to the lateral anterior right leg. (*Id*.) She characterized the pain as constant, severe, and burning. (*Id*.) Aggravating factors that contributed to her back pain were bending over, lifting, and movement. (*Id*.) Associated symptoms included numbness in the lower legs and foot, as well as weakness of the right lower leg. (*Id*.) Her pain interfered with her sleep. (*Id*.) Her physical exam showed tenderness at L4-L5 and normal gait. (*Id*. at 626.) She was assessed with pain in the lumbar region, degenerative disc disease, sacroiliac syndrome, ankylosing spondylitis, lumbar disc herniation, displacement of the lumbar intervertebral disc, lumbar radiculopathy, and menopause. (*Id*. at 627.)

8

On October 14, 2015, Scott Spoor, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) evaluation for Plaintiff based on the medical evidence of record. (*Id*. at 263-65.) He opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; push and/or pull without limitation other than shown for lift and/or carry; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and occasionally crawl. (*Id*. at 264.) He determined that Plaintiff's statements regarding her impairment related functional limitations and restrictions could not reasonably be accepted as consistent with the objective medical evidence and other evidence of record. (*Id*. at 265.)

On October 23, 2015, an MRI performed on Plaintiff's thoracic spine was normal with and without contrast. (*Id*. at 643.)

On November 9, 2015, Plaintiff met with Dr. Provenza for low back pain. (*Id*. at 674-77.) She reported that the pain was worsening and radiating to her right foot. (*Id*. at 674.) She described the pain as aching, burning, sharp, and shooting. (*Id*.) Symptoms were aggravated by ascending and descending stairs, bending, daily activities, extension, flexion, lifting, rolling over in bed, sitting, standing, twisting, and walking, but were relieved by pain medication. (*Id*.) She rated her pain as a 9 out of 10, and her physical exam showed tenderness in multiple areas of her lumbar spine and moderate pain with motion. (*Id*. at 676.)

On November 24, 2015, Plaintiff had a physical therapy evaluation. (*Id*. at 649.) She complained of chronic low back pain that was fairly constant and tended to be worse with standing or walking and claimed she could tolerate about 10 minutes of standing or walking. (*Id*.) She also reported difficulty bending and lifting secondary to low back pain, and prior physical therapy and

injections resulted in minimal improvement. (*Id.*) She rated her pain as an 8 out of 10 on the pain scale. (*Id.*) Following her evaluation, she was diagnosed with pain in her lumbar spine along with impaired lumbar spinal joint mobility, decreased core strength/stability, reduced lower extremity strength, and decreased standing/walking tolerance that impacted her ability to complete desired functional activities of daily living. (*Id.* at 651.) Her rehabilitation potential was fair, but it was noted that the chronic nature of her symptoms reduced her overall prognosis for improvement. (*Id.*)

On December 10, 2015, Plaintiff saw Erin K. Shiner, M.D., for fibromyalgia[3] syndrome. (*Id.* at 678-82.) Her symptoms had begun 3 years prior, and she reported them as being severe. (*Id.* at 678.) Her symptoms occurred constantly in her muscles and lower back, and she described them as aching. (*Id.*) Her symptoms were aggravated by exertion and relieved by medication. (*Id.*) Associated symptoms included fatigue and insomnia. (*Id.*) She stated that she was unable to work, and that she had fatigue and difficulty sleeping. (*Id.*) A review of systems showed she was positive for chills, fatigue, night sweats, weight gain, constipation, nausea, urinary frequency, insomnia, back pain, joint pain, muscle weakness in her back, legs, and feet, and easy bruising. (*Id.* at 679.) Her physical exam showed that she had dorsal hand edema without underlying synovitis and multiple severe tender points throughout her musculoskeletal area. (*Id.* at 680.) She also had tenderness in her thoracic spine and lumbar spine and mild pain with motion. (*Id.* at 680.) Her gait was normal. (*Id.*) She was assessed with severe fibromyalgia as well as chronic back pain. (*Id.* at 681.)

On January 4, 2016, Plaintiff returned to Dr. Shiner for fibromyalgia and suspected inflammatory arthritis. (*Id.* at 783-87.) She rated her pain at an 8 out of 10 and reported that she

---

[3] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." FIBROMYALGIA, Mayo Clinic (May 3, 2019, 1:00 PM), https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780.

still had a lot of burning and stiffness in her hands and feet. (*Id*. at 783, 786.) She was positive for fatigue, insomnia, dry mouth, urinary frequency, burning in her feet and hands, back pain, joint pain, joint swelling, muscle weakness, morning stiffness, affected feet/hands/back, and easy bleeding and bruising. (*Id*. at 784-85.) Her physical exam showed tenderness in her shoulders, mild rheumatoid arthritic changes in her hands, and mild metacarpophalangeal synovitis. (*Id*. at 785.) She was assessed with undifferentiated inflammatory arthritis and fibromyalgia. (*Id*. at 786.)

On January 7, 2016, Tina Ward, M.D., a SAMC, also completed a physical RFC evaluation for Plaintiff based on the medical evidence of record. (*Id*. at 287-88.) Her findings were identical to those of Dr. Spoor. (*See id*.)

From January 11, 2016 to January 31, 2016, Plaintiff underwent physical therapy for her lower back pain. (*Id*. at 764.) At an appointment on January 19, 2016, she reported that she was doing about the same overall and that she was very sore after her last treatment. (*Id*.) Her pain level was at a 6 out of 10. (*Id*.) It was noted that she was tolerating the treatment well with minimal increases in lower back pain and discomfort. (*Id*. at 765.) On January 28, 2016, she reported that she was not doing too bad and reported reduced lower back pain as compared to her prior visit. (*Id*.) Her pain level was rated as a 3 out of 10, and she seemed to benefit from exercise. (*Id*.)

On January 18, 2016, Plaintiff saw Dr. Provenza with complaints of moderate chronic pain in her whole back that was constant, and she said that she took medication which did not relieve her pain and only made her sleepy. (*Id*. at 788-91.) Hot showers helped to calm her back pain down. (*Id*.) She rated her pain at a 5 out of 10. (*Id*. at 790.) She had tenderness in her lumbar spine and moderate pain with motion, but her cervical spine, thoracic spine, gait, coordination, and fine motor skills were normal. (*Id*.) She was assessed with fibromyalgia and chronic back pain. (*Id*.)

11

That same day, she returned to Dr. Shiner for fibromyalgia. (*Id*. at 792-96.) Dr. Shiner noted that Plaintiff had persistent joint pain and stiffness that was worse in the morning. (*Id*. at 792.) She rated her pain as a 6 out of 10. (*Id*. at 795.) A review of systems was positive for fatigue, insomnia, burning in feet and hands, back pain, joint pain, muscle weakness, morning stiffness, easy bruising, and affected back, legs, and feet. (*Id*. at 793-94.) A physical exam revealed tenderness in her left shoulder, swelling in her hands, metacarpophalangeal puffiness, and multiple tender points throughout her musculoskeletal area. (*Id*. at 794.) She was assessed with undifferentiated inflammatory arthritis and fibromyalgia that was very symptomatic. (*Id*. at 795.)

On February 1, 2016, Plaintiff was again treated with physical therapy. (*Id*. at 773.) Following her first session, it was noted that her progress towards functional goals was fair, and she had tolerated the session fairly. (*Id*. at 773.) She reported increased pain following therapy and that she had not had significant improvement from it. (*Id*.) Her pain was chronic in nature with neuromotor instability to the lumbar spine. (*Id*.) She further stated that she was doing about the same overall and that her back continued to bother her intermittently, but it was typically worse with prolonged standing or walking. (*Id*. at 774.) Her physical therapist noted that she had made minimal progress since starting physical therapy with regards to reduced low back pain, improved walking tolerance, and increased lower extremity strength. (*Id*. at 775.) She remained limited by increased significant pain with prolonged walking/standing activities. (*Id*.)

On February 8, 2016, Plaintiff was seen by Mootaz Younis, M.D., for low back pain and a refill on Tramadol. (*Id*. at 827.) Her discomfort was most prominent in the mid and lower lumbar spine, and her chronic pain radiated to her lateral anterior right leg. (*Id*.) She characterized the pain as constant, severe, and burning, and associated symptoms included numbness in her lower legs and

feet, and weakness in her right lower leg. (*Id*.) Tenderness was noted at L4-L5, but she had a normal gait. (*Id*. at 829.) Plaintiff was assessed with low back pain and obesity. (*Id*.)

On February 29, 2016, Plaintiff returned to Dr. Shiner for fibromyalgia and rheumatoid arthritis. (*Id*. at 797.) She continued to have persistent joint pain and stiffness in her feet that was worse in the morning. (*Id*.) She rated her pain as an 8 out of 10. (*Id*. at 800.) She was positive for fatigue, night sweats, weight gain, dyspnea, abdominal pain, urinary frequency, neuropathy, insomnia, back pain, joint pain, joint swelling, and muscle weakness in her legs and feet. (*Id*. at 798-99.) Her gait was antalgic, she had foot/ankle pain, and multiple tender points throughout her musculoskeletal area. (*Id*. at 799.) Her diagnoses were unchanged from her previous appointment. (*Id*. at 800.)

On April 11, 2016, Plaintiff saw Dr. Provenza for persistent and worsening low back pain and reported her pain severity level at a 9 out of 10. (*Id*. at 687-90.) The pain was sharp and stabbing with similar aggravating factors as before, but her symptoms were relieved by heat. (*Id*. at 687.) She had no relief from facet injections or physical therapy. (*Id*.) Her physical exam was normal, except she had tenderness in her cervical, thoracic, and lumbar spine. (*Id*. at 689.) She was assessed with fibromyalgia, chronic back pain, and a BMI of 32.0-32.9. (*Id*.)

On April 27, 2016 and July 27, 2016, Plaintiff saw Dr. Shiner for rheumatoid arthritis and fibromyalgia, and he noted that she still had a lot of back pain. (*Id*. at 806-10, 819-23.) She was taking Zanaflex and PM Tramadol for her fibromyalgia at night, but her care was complicated by poor access to care, and she only had 3 refills paid for each month. (*Id*. at 806, 819.) She complained of pain in her thoracic and lumbar spine the most. (*Id*.) She denied any stiffness or pain in the joints in her hands and wrists at her second appointment. (*Id*. at 819.) She continued to have

fatigue, night sweats, urinary frequency, back pain, joint pain, muscle weakness, and morning stiffness, and rated her pain as an 8 out of 10 at her first appointment and 6 out of 10 at her second. (*Id*. at 808, 821.) She also had tenderness in her lumbar spine, swelling in her hands, and wrist and metacarpophalangeal puffiness. (*Id*. at 808-09, 822.) Her diagnoses remained the same as her prior appointment, and her BMI was 32.0-32.9. (*Id*. at 809, 822.) It was noted that her fibromyalgia was improved on Tizanidine and PM Tramadol. (*Id*.)

On May 3, 2016, Plaintiff underwent a CT scan of the lumbar spine which showed degenerative disc disease at L3-L4 and L4-L5 with posterior annular tears, broad-based 3-4mm bulging annular discs, and mild to moderate narrowing of the neural foramina bilaterally. (*Id*. at 703.) Her pain response appeared to be most severe and most similar to normal pain at the L4-L5 level. (*Id*. at 704.)

On June 1, 2016 and July 20, 2016, Plaintiff returned to Dr. Provenza for worsening low back pain which occurred persistently in her lower back and radiated to her lower extremities bilaterally. (*Id*. at 811-18.) She described the pain as burning and sharp, and reported that her symptoms were aggravated by bending, lifting, rolling over in bed, standing, twisting, and walking, but relieved by heat and pain medication. (*Id*.) She rated her pain as an 8 out of 10. (*Id*. at 812, 817.) Her physical exam was normal at her first appointment, but she had tenderness in her lumbar spine and moderate pain with motion at her second appointment. (*Id*. at 813, 817.) She was assessed with lumbar disc displacement and a BMI of 31.0-31.9. (*Id*.)

On August 17, 2016, Plaintiff underwent an anterior retroperitoneal approach to her lumbar spine and anterior arthrodesis at L3-L4, and a mechanical device was placed at L4-L5. (*Id*. at 869.) Following the procedure, she was taken to a recovery room in stable condition. (*Id*.) Her

postoperative diagnosis was lumbar disc displacement at L3-L4 and L4-L5.  (*Id*. at 870.)

On August 29, 2016, Plaintiff had a post-operation follow-up with Dr. Provenza.  (*Id*. at 865-68.)  She reported that she was in a lot of pain and rated it as a 9 out of 10.  (*Id*. at 865-66.)

On September 28, 2016, Dr. Provenza completed a medical source statement for Plaintiff. (*Id*. at 872-75.)  He noted that she was diagnosed with lumbar disc displacement without mylopathy and was in the healing process from her surgery.  (*Id*. at 872.)  He characterized her pain as chronic moderate lower back pain, and stated that she also had fibromyalgia, which caused inflammation at times.  (*Id*.)  Her symptoms could be expected to last at least 12 months.  (*Id*.)  He opined that Plaintiff could not do repetitive movements, including lifting, bending, and sitting.  (*Id*. at 873.) Rather than give exact time estimates as requested for the statement, Dr. Provenza then opined that Plaintiff could sit at one time before needing to stand, stand at one time before needing to sit, and sit/stand/walk during an 8-hour workday only as much as she could tolerate without pain.  (*Id*.)  He also opined that she would need a job that allowed her to shift positions at will from sitting, standing, or walking; periods of walking around during an 8-hour workday; and unscheduled breaks during the workday at times due to pain/paresthesias or numbness.  (*Id*.)  Her legs did not need to be elevated, and she did not need a cane or other assistive device to stand/walk.  (*Id*. at 874.)  He further opined that Plaintiff could occasionally lift and carry 10 pounds and never climb ladders, and that she had no limitations with reaching, handling, or fingering.  (*Id*.)  She was capable of tolerating moderate stress of normal work and making sound decisions, and her impairments were likely to produce good days and bad days.  (*Id*. at 875.)  Dr. Provenza did not estimate how many days Plaintiff would be absent from work per month, and stating that it depended on her pain level.  (*Id*.) He concluded that her impairments as demonstrated by signs, clinical findings, and laboratory or test

15

results, were not reasonably consistent with the symptoms and functional limitations described in his evaluation but failed to explain why. (*Id.*)

**C.    Hearing**

On September 13, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 200-15.) Plaintiff was represented by an attorney. (*Id.* at 202.)

**1.    Plaintiff's Testimony**

Plaintiff testified that she was 48 years old, had a high school education, and had not worked since May 16, 2015, the alleged onset date. (*Id.* at 202-03.) She lived with her husband, who supported her, and was right-handed, 5'6" tall, and weighed 194 pounds. (*Id.* at 203, 205.)

She underwent surgery on her lower back on August 16, 2015, but she was still having problems where her L3 and L5 vertebrae were fused. (*Id.* at 203-05.) It was still painful. and she had a lot of leg cramps. (*Id.* at 205.) She also could not lift her left leg up very high and needed help to get dressed. (*Id.*) Following the surgery, she felt pain and continued to have muscle spasms in her legs and back all day, but she no longer had numbness in her legs. (*Id.* at 205-06.) Plaintiff also had 2 other discs that were still deteriorating in her back. (*Id.* at 206.) She had a lot of shooting pains in her legs, mainly on the right side that went all the way down, as well as shooting pains in her back. (*Id.*) It was hard for her to get up, she would have a lot of shooting pains in her back when she stood and walked, and her legs would cramp up really bad. (*Id.* at 207.) She estimated that she could stand and walk for about 20-30 minutes before she would have to sit because of her pain. (*Id.*) When she would sit, she had to move a lot because it was painful, and her legs would cramp up and get shooting pains. (*Id.*) She would cry and try to move around to situate herself better when she was in pain. (*Id.*) She took pain medication and muscle relaxers, which helped her to better cope

with her problems. (*Id.* at 206.) She was also scheduled for physical therapy. (*Id.* at 207-08.)

Plaintiff stayed close to home, and when she was home, she laid down a lot and used a heating pad most of the day. (*Id.* at 207.) She would also sit and drink coffee and try to get housework done, but it took her a while to do things because she would only do a little bit each day. (*Id.* at 208.) She slept a lot, and her medications helped her sleep because she was usually up most of the night. (*Id.*) When she watched television or read, she would fall asleep. (*Id.*)

### 2.    VE's Testimony

The VE testified that Plaintiff had past work experience as a housekeeping cleaner, DOT 323.687-014 (SVP 2, light, unskilled); janitor, DOT 381.687-014 (SVP 2, heavy, unskilled); and cook/helper, DOT 317.687-010 (SVP 2, medium, unskilled). (*Id.* at 211.)

The VE considered a hypothetical individual with the same age, education, and work history as Plaintiff who could perform light exertional level work with the following limitations: she could occasionally climb ladders, ramps, or stairs, and occasionally crawl. (*Id.*) This individual would not be able to perform any of Plaintiff's past work. (*Id.* at 211-12.) This individual would be able to perform other work such as a shirt presser, DOT 363.685-026 (SVP 2, light, unskilled), with about 40,000 jobs nationally; ticket taker, DOT 344.687-010 (SVP 2, light, unskilled), with about 102,000 jobs nationally; and a collator, DOT 653.687-010 (SVP 2, light, unskilled), with about 287,000 jobs nationally. (*Id.* at 212.)

The VE next considered a hypothetical individual who could perform sedentary work with the following limitations: she could only occasionally stoop, kneel, and crouch; and she would have a sit/stand option that would allow her to alternate between sitting, standing, and walking 3 times in the morning and 3 times in the afternoon for periods not to exceed 5 minutes. (*Id.* at 212-13.)

This individual would not be able to perform any of Plaintiff's past work. (*Id*. at 213.) This individual would be able to perform jobs as a food and beverage order clerk, DOT 209.567-014 (SVP 2, sedentary, unskilled), with about 215,000 jobs nationally; ticket counter, DOT 219.587-010 (SVP 2, sedentary, unskilled), with about 25,000 jobs nationally; and a telephone quotation clerk, DOT 237.367-046 (SVP 2, sedentary, unskilled), with about 39,000 jobs nationally. (*Id*.) Although the DOT did not specifically address the sit/stand option or positional change, these jobs were primarily verbal in nature or could easily be performed in either posture, particularly with breaks that were that brief in nature. (*Id*.)

The VE then considered a hypothetical individual who could sit, stand, or walk for up to 6 hours per day, but would need to be away from her workstation either reclining or elevating her legs or laying down the remaining 2 hours of the day. (*Id*. at 213-14.) No full time work would be available for this individual. (*Id*.)

In response to questioning from Plaintiff's attorney, the VE stated that an individual who would need 4 separate 15 minute scheduled breaks during the day would not be able to maintain employment. (*Id*. at 214.) An individual who would be off task for 20% of the day would also not be able to maintain employment. (*Id*.)

**D.    ALJ's Findings**

The ALJ issued a decision denying benefits on May 8, 2017. (*Id*. at 151-60.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 16, 2015, the alleged onset date. (*Id*. at 153.) At step two, the ALJ found that Plaintiff had the following severe impairments: osteoarthritis, degenerative disc disease of the lumbar spine, status post-anterior arthrodesis at L3-4 and placed mechanical device at L4-5, inflammatory arthritis, and obesity. (*Id*.)

Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 154.)

The ALJ then determined that Plaintiff retained the RFC to perform sedentary work, but she could only occasionally stoop, kneel, and crouch. (*Id*. at 155.) She further determined that Plaintiff required a sit/stand option that permitted her to alternate from sitting, standing, and walking, 3 times in the morning and 3 times in the afternoon, for a total of 6 times per day, with each change not to exceed 5 minutes in duration. (*Id*.) At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work. (*Id*. at 158.) At step five, the ALJ found that transferability of job skills was not an issue because utilizing the Medical-Vocational Rules, she was not disabled whether or not she had transferable job skills, and considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*. at 159.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from May 16, 2015, through May 8, 2017. (*Id*. at 160.)

**E.    New Evidence Submitted to the Appeals Council**

Plaintiff timely appealed the ALJ's decision to the Appeals Council and submitted almost 160 pages of new evidence from Dr. Provenza, Brandon Ohman, M.D., United Regional Medical Center, Family Health Center, Dr. Shiner, and Texoma Urology Center. (*See id*. at 7.) The Appeals Council denied Plaintiff's request for review on April 27, 2018, and determined that the additional evidence, which was dated between October 31, 2016 and May 8, 2017, did "not show a reasonable probability that it would change the outcome of the decision," and therefore the Appeals Council "did not consider and exhibit this evidence." (*Id*. at 6-7.) The Appeals Council then determined that

additional evidence dated from May 20, 2017 through January 28, 2018 did "not relate to the period at issue" because the ALJ decided the case through May 8, 2017, and therefore this additional evidence "did not affect the decision about whether [Plaintiff] was disabled beginning on or before May 8, 2017." (*Id*. at 7.)

### 1.    Dr. Provenza

The evidence from Dr. Provenza consisted of treatment records from October 31, 2016, November 30, 2016, and July 27, 2017, MRI results dated May 30, 2017, and a letter dated January 25, 2018. (*See id*. at 14, 87-91, 92-103.) On October 31, 2016, Plaintiff had a post-operative appointment following her August 17, 2016 spinal surgery. (*Id*. at 99.) She reported aching, burning pain that was rated at a 5 out of 10 on the pain scale. (*Id*. at 99, 102.) On November 30, 2016, she rated her pain as a 7 out of 10 in her lower back and it was noted that the problem was fluctuating and occurred persistently. (*Id*. at 94.) The pain radiated to her left thigh and was described as sharp and aching. (*Id*.) Her symptoms were aggravated by bending, lifting, sitting, standing, and walking, and relieved by pain medication. (*Id*. at 94.) She also had sacroiliac tenderness in her right pelvis, and was assessed with sacroiliac joint dysfunction and a BMI of 31.0-31.9. (*Id*. at 97.) On July 27, 2017, Plaintiff reported that the pain was in her lower back, occurred intermittently, and was at a 6 out of 10. (*Id*. at 87.) She described the pain as burning, sharp, and shooting. (*Id*.) Her symptoms were aggravated by bending, standing, and walking. (*Id*.)

Following a referral from Dr. Provenza, Plaintiff underwent an MRI on May 30, 2017. (*Id*. at 92-93.) The MRI showed postoperative changes related to her previous anterior fusion surgery at the L3-L4 and L4-L5 interspaces, no site of central canal stenosis or descending nerve root extrinsic compression, bilateral neural foraminal narrowing at the L3-L4 and L4-L5 levels, and mild

to moderate facet joint primary osteoarthritis. (*Id*.) It was also noted that her bilateral neural foraminal narrowing could be associated extrinsic compression upon the exiting left L3 and L4 nerve roots. (*Id*. at 92.)

The January 25, 2018 letter from Dr. Provenza stated that Plaintiff was currently under his "medical care and had a surgical lumbar decompression which[,] due to the healing process and the manipulation of tissue, muscles and nerves during surgery," would prevent her from sitting and standing for periods of time. (*Id*. at 14.) He included his contact information in case additional information was required. (*Id*.)

### 2.    Dr. Ohman

The evidence from Dr. Ohman consisted of treatment records from December 9, 2016, January 5, 2017, March 17, 2017, and April 5, 2017. (*Id*. at 133-37, 142-47, 167-93.) Plaintiff presented to Dr. Ohman with worsening lower back pain that she rated as high as a 9 out of 10, but had rated it as low as a 5 out of 10 at her last appointment. (*Id*. at 167, 179, 182, 188.) The pain radiated to her lower extremities and was burning, discomforting, piercing, shooting, stabbing, and throbbing. (*Id*.) Her symptoms were aggravated by daily activities, sitting, twisting, and walking, but relieved by heat, rest, lying down, and pain medication. (*Id*.) Her physical exams showed that she had pain in her hip with motion, antalgic compensated gait; lumbar spasms; tenderness in the sacroiliac joint, lumbar, and sciatic notch; pain in the right buttock; pain in the sacroiliac joint; positive Faber's test on the right; positive straight leg raise test on the right; and back pain in the left and right. (*Id*. at 179, 184.) She also had moderate pain with range of motion in her lumbar spine, mild restriction in flexion, and moderate restriction in extension. (*Id*.) She later had moderate restrictions in flexion, extension, and lateral bending in her lumbar spine. (*Id*. at 179.) At her April

appointment, she reported that she still had 50% relief from a caudal epidural steroid injection, her gait was normal, she could heel and toe walk normally, she had no tenderness, and she did not have pain with motion, but she did have pain in her right buttock. (*Id*. at 170.) She had full range of motion and was pain free in her lumbar spine at this last appointment. (*Id*.)

### 3.   United Regional Physician Group

On December 9, 2016, Plaintiff underwent a right piriformis injection due to right side piriformis syndrome and a right sacroiliac joint injection due to sacroiliac joint dysfunction. (*Id*. at 142.) She had pain improvement of 70%. (*Id*. at 147.)

On March 21, 2017, Plaintiff underwent a caudal epidural steroid injection due to right lumbar radiculitis. (*Id*. at 133-36, 173-74.) She had 100% pain improvement. (*Id*. at 137.)

### 4.   Family Health Center

The evidence from the Family Health Center consisted of treatment records from January 9, 2017 to August 24, 2017, for chronic back pain. (*See id*. at 24-84.) At her initial appointment, Plaintiff complained of low back pain in her midline that was worse with movement and radiating to both buttocks. (*Id*. at 81.) It was consistently noted that her back pain was chronic, located in the mid-lumbar area on the right, rated between a 6-8 out of 10 in severity, and radiated to the lateral anterior right leg. (*Id*. at 24, 30, 37, 43, 51, 55, 66.) She characterized it as constant, severe, and burning. (*Id*.) Her pain was aggravated by walking, bending over, and lifting objects, and relieved by rest and laying down. (*Id*.) She denied any numbness in her lower legs and feet, and reported no weakness in her lower extremities. (*Id*.) She was taking Norco, which controlled her pain fairly well, and she had no side effects. (*Id*.) A review of systems showed chronic localized joint pain in her lower back. (*Id*. at 24, 30, 38.) Her cervical spine showed no abnormalities, but her lumbosacral

spine exhibited tenderness on palpation of the spinous process lumbar area.  (*Id*. at 26, 32, 39, 51, 57, 63, 68, 73, 78, 82-83.)  Her lumbosacral spine also exhibited no spasms of the paraspinal muscles.  (*Id*.)  Her assessments included intervertebral disc degeneration and low back pain.  (*Id*. at 27, 33, 40, 45, 51, 57, 68, 83.)

     **5.**       **Dr. Shiner**

The treatment record from Dr. Shiner, dated March 23, 2017, showed that Plaintiff was treated for fibromyalgia and inflammatory arthritis.  (*Id*. at 195.)  She had last been seen in July 2016.  (*Id*.)  Plaintiff began having more joint pain and stiffness when she stopped taking her medication, but she was taking Zanaflex and PM Tramadol at night for her fibromyalgia.  (*Id*.)  Her care was complicated by poor access to care, and she could only get 3 prescriptions paid for each month.  (*Id*.)  She rated her pain at a 3 out of 10 on the pain scale.  (*Id*. at 197.)  A review of systems was positive for weight gain, insomnia, urinary incontinence, burning hands/feet, back pain, joint pain, joint swelling, muscle weakness, and morning stiffness.  (*Id*.)  Her physical exam showed mild pain with motion in her shoulders and swelling in her hands.  (*Id*. at 198.)  She also had metacarpophalangeals, and her wrists were puffy.  (*Id*.)  She was assessed with undifferentiated inflammatory arthritis and low back pain.  (*Id*.)

     **6.**       **Texoma Urology Center**

Finally, Plaintiff submitted records from Texoma Urology Center, dated June 6, 2017 and July 27, 2017.  (*Id*. at 104-12.)  These records showed that Plaintiff was treated for urge incontinence because she had problems getting to the bathroom on time after she had the urge to urinate.  (*Id*. at 105, 109.)  She reported incontinence as well as chronic back pain, neck pain, and sore muscles.  (*Id*. at 106, 110.)  She also reported numbness and tingling.  (*Id*.)  She had normal gait and station

of head and neck.  (*Id.*)

## II. STANDARD OF REVIEW

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640

(5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.    If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d

at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1    The decision must [be] remanded because the medical source statement . . . from the treating specialist demand[ed] controlling weight.

2.    The decision must be remanded because the Plaintiff's fibromyalgia was not found to be a severe (or non-severe) impairment.[4]

3.    The decision must be reman[d]ed because the residual functional capacity assessment in the decision is not function by function.

4.    The dec[i]sion must be remanded because of the failure of the Appeal's Council . . . to address the post hearing evidence and [medical source statement].

(doc. 18 at 2.)

### A.    <u>Severe Impairment</u>

Plaintiff argues that the ALJ erred in failing to determine whether her fibromyalgia was a severe or non-severe impairment. (*Id*. at 24-25.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not

---

[4] Although listed second, Plaintiff's issue regarding consideration of fibromyalgia as a severe impairment implicates step two, which comes before the RFC assessment in the sequential evaluation process. Accordingly, the Court first addresses Plaintiff's second issue regarding the alleged severe impairment.

severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id*. at 1101. In other words, "the claimant [need only] make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ determined that Plaintiff had the following severe impairments: osteoarthritis, degenerative disc disease of the lumbar spine, status post anterior arthrodesis at L3-4 and placed mechanical device at L4-5, inflammatory arthritis, and obesity. (doc. 13-1 at 153.) She determined that Plaintiff's asthma and plantar fasciitis were non-severe impairments. (*Id*.) The ALJ's step two discussion did not address or mention Plaintiff's fibromyalgia, however. (*See id*. at 153-54.)

Although the ALJ did not mention her fibromyalgia at step two, it does not appear that her

fibromyalgia could reasonably be said to constitute a "medically determinable impairment." "Due to the complexity and the numerous cases dealing with fibromyalgia . . . , the SSA has issued Social Security Ruling [(SSR)] 12-2p to provide clearer guidance and policy interpretation of this impairment." *Titles II and XVI: Evaluation of Fibromyalgia*, SSR 12–2p, 2012 WL 3104869, at *1–6 (July 25, 2012); Harvey L. McCormick, *Fibromyalgia*, 1 Soc. Sec. Claims & Proc. § 8:151 (6th ed.) (last updated Aug. 2014).  Ruling 12–2p offers two tests for determining whether a claimant's fibromyalgia qualifies as a medically determinable impairment.  *See* SSR 12–2p, 2012 WL 3104869, at *2–3.  Under the first test, a claimant has a medically determinable fibromyalgia impairment when he or she proves:

> 1. A history of widespread pain in all quadrants of the body lasting at least three months, including pain in the right and left sides of the body (both above and below the waist) and in the cervical spine, anterior chest, thoracic spine, or low back;
>
> 2. At least 11 positive tender points during a physical examination; and
>
> 3. Evidence that other disorders that could cause the symptoms or signs were excluded, such as evidence of examinations and tests that rule out other disorders that could account for the person's symptoms and signs.  *Id.*[5]

Under the second test, a claimant has a medically determinable fibromyalgia impairment when he or she proves:

> 1. A history of widespread pain in all quadrants of the body lasting at least three months, including pain in the right and left sides of the body (both above and below the waist) and in the cervical spine, anterior chest, thoracic spine, or low back;
>
> 2. Repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

---

[5]  The first test is known as The 1990 ACR Criteria for the Classification of Fibromyalgia.

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  *Id*. at *3.[6]

Here, Plaintiff points to medical records from Dr. Shiner noting that she had symptoms of fibromyalgia and was diagnosed with it. (doc. 18 at 25-26.)  Those records showed that she reported pain at her appointments from December 2015 to July 2016, and that her symptoms included burning and stiffness in her hands and feet, chills, fatigue, insomnia, dry mouth, night sweats, weight gain, abdominal pain, constipation, nausea, urinary frequency, insomnia, neuropathy, back pain, joint pain, joint swelling, morning stiffness, muscle weakness in her back, legs, and feet, and easy bleeding and bruising.  (doc. 13-1 at 678-82, 783-87, 792-95, 797-800, 806-10, 819-23.)  Her physical exams showed that she had antalgic gait at times, foot and ankle pain, dorsal hand edema without underlying synovitis, swelling in her hands, metacarpophalangeal puffiness, and multiple severe tender points throughout her musculoskeletal area.  (*Id*. at 680, 785, 794, 799, 808-09, 822.)  She also had tenderness in her shoulders, thoracic spine, and lumbar spine, as well as mild pain with motion.  (*Id*.)  Throughout her appointments, she described the majority of her pain as being in her back.  (*Id*. at 678, 793-94, 806, 809, 819, 822.)  She was consistently diagnosed with fibromyalgia during her appointments with Dr. Shiner, and it was later noted at two appointments as having improved on Tizanidine and PM Tramadol.  (*Id*. at 681, 786, 790, 795, 800, 809, 822.)

Even assuming that the first two elements of either test are met, none of the evidence related to Plaintiff's fibromyalgia shows that other disorders that could have caused her repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  *See* SSR 12–2p, 2012 WL 3104869, at *2–3; *see Hills v. Comm'r of Soc. Sec.*, No. 17-46-RLB, 2018 WL 1914291, at *3

---

[6]  The second test is known as The 2010 ACR Preliminary Diagnostic Criteria.

(M.D. La. Apr. 23, 2018) ("The record must contain all three prongs of at least one of the two paths laid out in SSR 12-2p."). Throughout her appointments with Dr. Shiner for fibromyalgia, she was also treated for and diagnosed with rheumatoid arthritis, and the continuous evidence in the record of both diagnoses as well as "a lack of test results ruling out other diagnoses, [such as her spinal disorders,] that could cause Plaintiff's signs or symptoms" fails to show that her fibromyalgia was a medically determinable impairment such that the ALJ was required to determine whether it was severe or non-severe. *See Hills*, 2018 WL 1914291, at *5. "Without first showing the existence of a medically determinable impairment of fibromyalgia, it is difficult to understand how Plaintiff could establish that fibromyalgia is a severe impairment in the first instance." *Mayeux v. Comm'r of Soc. Sec. Admin.*, No. 16-755-EWD, 2018 WL 297588, at *4 (M.D. La. Jan. 4, 2018). Additionally, "the existence of a diagnosis of fibromyalgia in a record before the ALJ does not necessarily equate to the existence of a medically determinable impairment." *Hills*, 2018 WL 1914291, at *3. Accordingly, Plaintiff has failed to meet her burden to show that the ALJ erred in determining the severity of her fibromyalgia at step two.

Moreover, even if the ALJ had committed error, the Fifth Circuit has stated that a failure to make a severity finding at step two is not reversible error when an ALJ continues with the sequential evaluation process. *Herrera*, 406 F. App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found."). While the ALJ did not consider whether fibromyalgia was a severe impairment, she noted that there was "speculation

of fibromyalgia" and cited to evidence from Dr. Shiner in assessing Plaintiff's RFC.  (*See* doc. 13-1

at 157-58.)  Therefore, any error was harmless because she proceeded beyond step two.  *See Norris*

*v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding

that even if the ALJ erred in failing to explain why he found only certain impairments to be severe,

the error was harmless where he proceeded with the sequential evaluation process).

## B.   <u>RFC Assessment</u>[7]

Plaintiff also argues that the ALJ erred in determining her RFC.  (doc. 18 at 18-24, 26-27.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1).  It "is an assessment of an individual's ability

to do sustained work-related physical and mental activities in a work setting on a regular and

continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2,

1996).  An individual's RFC should be based on all of the relevant evidence in the case record,

including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R.

§ 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  The ALJ "is responsible for assessing

the medical evidence and determining the claimant's residual functional capacity."  *Perez v.*

*Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or

restriction as to a functional capacity when there is no allegation of a physical or mental limitation

or restriction regarding that capacity, and no information in the record indicates that such a

limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision

can be supported by substantial evidence even if she does not specifically discuss all the evidence

---

[7]  Because Plaintiff's first and third issues implicate the ALJ's RFC assessment, they will be considered together.
(*See* doc. 18 at 2.)

31

that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after making a credibility finding regarding Plaintiff's symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff retained the RFC to perform sedentary work, but she could only occasionally stoop, kneel, and crouch. (doc. 13-1 at 155.) The ALJ further determined that Plaintiff required a sit/stand option that permitted her to alternate from sitting, standing, and walking, 3 times in the morning and 3 times in the afternoon, for a total of 6 times per day, with each change not to exceed 5 minutes in duration. (*Id.*)

### 1.    Treating Physician

Plaintiff contends that the ALJ erred because she failed to give Dr. Provenza's medical source statement controlling weight and failed to conduct a factor-by-factor analysis under 20 C.F.R.

§ 404.1527.  (doc. 18 at 17-24.)[8]

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1529(b).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  *Id*. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id*. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id*. § 404.1527(c)(2).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id*. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.  *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician

---

[8]  Although Plaintiff initially appears to challenge the ALJ's consideration of two medical source statements, it is apparent from her arguments that she only challenges her consideration of Dr. Provenza's September 28, 2016 medical source statement.  (*See* doc. 18 at 17-24.)

may be rejected.  *Id*.  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id*. at 455–56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)."  *Id*. at 453.  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id*. at 458.

Dr. Provenza completed a medical source statement for Plaintiff on September 28, 2016. (doc. 13-1 at 872-75.) He opined that Plaintiff could not do repetitive movements, including lifting, bending, and sitting.  (*Id*. at 873.)  Rather than provide exact time estimates as requested for the statement, he opined that Plaintiff could sit at one time before needing to stand, stand at one time before needing to sit, and sit/stand/walk during an 8-hour workday only as much as she could tolerate without pain.  (*Id*.)  He then opined that she would need a job that allowed her to shift positions at will from sitting, standing, or walking, periods of walking around during an 8-hour workday, and to take unscheduled breaks during the workday at times due to pain/paresthesias or numbness.  (*Id*.)  He further opined that Plaintiff could occasionally lift and carry 10 pounds and never climb ladders, and that she had no limitations with reaching, handling, or fingering.  (*Id*. at

874.)  She was capable of tolerating moderate stress of normal work and making sound decisions, and her impairments were likely to produce good days and bad days.  (*Id*. at 875.)  Dr. Provenza did not estimate how many days Plaintiff would be absent from work per month, and instead stated that it depended on her pain level.  (*Id*.)  He concluded that her impairments, as demonstrated by signs, clinical findings, and laboratory or test results, were not reasonably consistent with the symptoms and functional limitations described in his evaluation but failed to explain why.  (*Id*.)

The ALJ considered the medical source statement from Dr. Provenza and determined that his opinion was entitled to only partial weight because his opinion was internally inconsistent as well as inconsistent with the treatment records.  (*Id*. at 158.)  In making this determination, the ALJ noted Dr. Provenza's opinion that Plaintiff could not do repetitive movements but could lift 10 pounds occasionally, and sit, stand, and walk as much as she could tolerate without pain.  (*Id*.)  She Dr. Provenza's opinion that Plaintiff could make sound decisions and that her symptoms were not reasonably consistent with her alleged functional limitations.  (*Id*.)  The ALJ also noted that Plaintiff had stopped taking her medication due to an upset stomach, but her arthritis improved since she began taking her medication again, and that the majority of the treatment records indicated full range of motion in her upper and lower extremities.  (*Id*.)  The ALJ identified evidence that following conservative treatment measures, Plaintiff underwent an anterior arthrodesis at L3-L4 and placed mechanical device at L4-L5, after which she complained of "a lot of pain."  (*Id*.)  She also considered the other evidence of record, including Plaintiff's treatment records, the objective test results, and the opinion evidence.  (*See id*. at 156-58.)  Because the ALJ found that Dr. Provenza's opinion was internally inconsistent as well as inconsistent with the objective medical evidence of record, she could reject his opinion as not controlling without the need to perform a factor-by-factor

35

analysis. *See Newton*, 209 F.3d at 458; *Wilson v. Colvin*, No. 3:13-CV-1304-N, 2014 WL 1243684, at 8-9 (N.D. Tex. Mar. 26, 2014). She could also discount Dr. Provenza's opinion because the majority of Dr. Provenza's medical source statement was only a "brief and conclusory" check-box questionnaire that lacked explanatory notes or supporting objective tests and examinations, which the Fifth Circuit has recognized are not entitled to considerable weight. *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011).

### 2.    Function-by-Function Analysis

Plaintiff also argues that the ALJ's decision must be remanded because the RFC assessment "is not function by function." (doc. 18 at 26-27.) She claims that the ALJ failed to discuss any of the seven strength demands and violated Social Security Ruling 96-8 by stating the RFC in terms of the exertional levels of work. (*Id.*)

In making an RFC determination, the ALJ must perform a function-by-function assessment of the claimant's capacity to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and taking into account "both exertional and nonexertional factors." *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citing SSR 96-8P, 1996 WL 374184, at *3–6 (S.S.A. July 2, 1996)). Exertional factors involve seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-8P, 1996 WL 374184, at *5. Non-exertional factors include "all work-related limitations that do not depend on an individual's physical strength," such as postural and manipulative limitations. *Id.* at *6. "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work" at step four or perform other "types of work" at step five. *Id.* at *3–4; *accord Myers*, 238 F.3d at 620.

The RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." *Id*. at *1. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id*. Even if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis. *Beck v. Barnhart*, 205 F. App'x 207, 213–14 (5th Cir. 2006) (per curiam); *Onishea v. Barnhart*, 116 F. App'x. 1 (5th Cir. 2004) (per curiam).

Here, as noted, the ALJ determined that Plaintiff had the RFC to perform sedentary work, but she could only occasionally stoop, kneel, and crouch. (doc. 13-1 at 155.) She further determined that Plaintiff required a sit/stand option that permitted her to alternate from sitting, standing, and walking, 3 times in the morning and 3 times in the afternoon, for a total of 6 times per day, with each change not to exceed 5 minutes in duration. (*Id*.) Although the ALJ did not conduct a function-by-function analysis of Plaintiff's physical work-related activities in accordance with SSR 96-8p, she based her determination, in part, on the medical reports from SAMC Drs. Spoor and Ward, which contained function-by-function analyses of the impact of Plaintiff's impairments on her ability to perform various work-related tasks. (doc. 13-1 at 158.) These reports, in conjunction with the testimony and medical evidence of record relied on by the ALJ in making the RFC determination, "satisfy the function-by-function assessment requirement in SSR 96-8p." *McMillian v. Colvin*, No. 4:12-CV-661-A, 2014 WL 61172, at *10 (N.D. Tex. Jan. 6, 2014); *see Beck*, 205 F.

App'x at 213–14.  Because the ALJ relied in part on SAMC reports containing function-by-function analyses, her RFC determination is "supported by substantial evidence and satisfies the standards announced in *Myers*" and SSR 96-8p.  *Beck*, 205 F. App'x at 213–14; *see Onishea*, 116 F. App'x at 2 (finding that an RFC assessment, based in part on a state examiner's function-by-function analysis of the claimant's exertional limitations, satisfied the legal standard set forth in *Myers* and SSR 96–8p); *see also Chavira v. Astrue*, No. 11-CV-00262, 2012 WL 948743, at *9, 23 (S.D. Tex. Feb. 29, 2012) (finding that the ALJ's finding that the claimant could perform sedentary work satisfied SSR 96–8p where the ALJ evaluated the RFC of an SAMC who determined that the claimant was able to perform light work).

In summary, the ALJ did not err in evaluating Dr. Provenza's opinions in the medical source statement or in failing to conduct a function-by-function analysis, and her RFC assessment is supported by substantial evidence.  *Leggett*, 67 F.3d at 564.

**C.**    **New Evidence to Appeals Council**

In her final issue, Plaintiff argues that this case must be remanded because the Appeals Council failed to address the post-hearing evidence.  (doc. 18 at 27-31.)

When a claimant submits new and material evidence that relates to the period before the date of the ALJ's decision, the Appeals Council must consider the evidence in deciding whether to grant a request for review.  20 C.F.R. § 404.970(b).  The regulations do not require the Appeals Council to discuss the newly submitted evidence or to give reasons for denying review.  *See Sun v. Colvin*, 793 F.3d 502, 511 (5th Cir. 2015).  New evidence submitted to the Appeals Council becomes part of the record upon which the Commissioner's decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).  A court considering the Appeals Council's decision must review the

record as a whole to determine whether the Commissioner's decision is supported by substantial evidence, and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes unsupported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006); *Morton v. Astrue*, No. 3:10-CV-1076-D, 2011 WL 2455566 at *7 (N.D. Tex. June 20, 2011) ("The proper inquiry concerning new evidence takes place in the district court, which considers whether, in light of the new evidence, the Commissioner's findings are still supported by substantial evidence.") (citations omitted).

Newly submitted evidence is material if: (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination. *Castillo v. Barnhart*, 325 F.3d 550, 551–52 (5th Cir. 2003). Evidence of a later-acquired disability or a subsequent deterioration of a non-disabling condition is not material. *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985). Generally, "the Commissioner need 'not concern evidence of later-acquired disability or of the subsequent deterioration of the previously nondisabling condition'" because it fails to meet the materiality requirement. *Powell v. Colvin*, No. 3:12-CV-1489-BH, 2013 WL 5433496 at *11 n.9 (N.D. Tex. 2013) (quoting *Johnson*, 767 F.2d at 183). Post-dated records may meet the first prong of materiality, however, as long as the records relate to the time period for which disability benefits were denied. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (holding that new evidence of scar tissue related to the adjudicative period because it resulted from a prior surgery).

When she appealed the ALJ's decision to the Appeals Council, Plaintiff submitted almost 160 pages of new evidence from Dr. Provenza, Dr. Ohman, United Regional Medical Center, Family Health Center, Dr. Shiner, and Texoma Urology Center. (doc. 13-1 at 7.) The Appeals Council

denied her request for review on April 27, 2018, and determined that the additional evidence that was dated between October 31, 2016 and May 8, 2017, and did "not show a reasonable probability that it would change the outcome of the decision," and therefore the Appeals Council "did not consider and exhibit this evidence." (*Id.* at 6-7.) The Appeals Council then determined that the additional evidence dated from May 20, 2017 through January 28, 2018, did "not relate to the period at issue" because the ALJ decided the case through May 8, 2017, and therefore, this additional evidence "did not affect the decision about whether [Plaintiff] was disabled beginning on or before May 8, 2017." (*Id.* at 7.)

Plaintiff appears to contend that the Appeals Council should have formally analyzed and/or summarized the new evidence. (*See* doc. 18 at 27-31.) She fails to point to any authority requiring such an extensive analysis of new evidence when the Appeals Council denies a request for review, however. *See Sun*, 793 F.3d 502, 511 (5th Cir. 2015) (explaining that the "[social security] regulations do not require the AC to provide a discussion of the newly submitted evidence or give reasons for denying review"); *see also Jones v. Astrue*, 228 F. App'x 403, 407 (5th Cir. 2007) (refusing to accept the plaintiff's argument that "the district court should have remanded the case because the Appeals Council did not explain the weight that it gave to [the plaintiff's] new evidence" because "we determined that such an explanation was not required").

Even if the Appeals Council did have to formally analyze and summarize the new evidence, Plaintiff has not shown that the new evidence diluted the record to the extent that the ALJ's decision became insufficiently supported. *See Higginbotham*, 163 F. App'x at 281–82. Plaintiff first relies on evidence from her follow-up appointments that took place between 2016 and 2017. (doc. 18 at 29.) This evidence showed that Plaintiff continued to have lower back pain that radiated to her

lower extremities at times, and she rated the pain as high as a 9 out of 10 but as low as a 3 out of 10

on the pain scale.  (doc. 13-1 at 24, 30, 37, 43, 51, 55, 66, 94, 99 ,102, 167, 179, 182, 188, 195, 197.)

 She described the pain as burning, discomforting, piercing, shooting, stabbing, and throbbing, and

her symptoms were aggravated by daily activities, sitting, bending, lifting, twisting, and walking,

but relieved by heat, rest, lying down, and pain medication.  (*Id*. at  24, 30, 37, 43, 51, 55, 66, 167,

179, 182, 188.)  Her physical exams with Dr. Ohman showed that she had pain in her hip with

motion, antalgic compensated gait; lumbar spasms; tenderness in the sacroiliac joint, lumbar, and

sciatic notch; pain in the right buttock; pain in the sacroiliac joint; positive Faber's test on the right;

positive straight leg raise test on the right; and back pain in the left and right. (*Id*. at 179, 184.)  She

also had moderate pain with range of motion in her lumbar spine, mild to moderate restriction in

flexion, and moderate restriction in extension.  (*Id*.)  At her later appointment with Dr. Ohman,

however, she still had 50% relief from a caudal epidural steroid injection, her gait was normal, she

could heel and toe walk normally, she had no tenderness, she did not have pain with motion but did

have pain in her right buttock, and she had full range of motion in her lumbar spine.  (*Id*. at 170.)

She also denied numbness in her lower legs and feet, and reported no weakness in her lower

extremities at an appointment at the Family Health Center.  (*Id*. at 24, 30, 37, 43, 51, 55, 66.)

Plaintiff also received injections for her pain and experienced some, if not full, relief. (*Id*. at 133-37,

147.)  This evidence does not undermine or dilute the evidence that the ALJ relied on, and it is not

inconsistent with her finding that Plaintiff maintained the RFC for sedentary jobs that existed in

significant numbers in the economy with the additional limitations stated in her RFC determination.

*See Okolie v. Astrue*, No. 04:07-CV-485-Y, 2008 WL 1947103, at *4 (N.D. Tex. May 2, 2008)

(applying similar reasoning to reach a similar conclusion).

Plaintiff also argues that the most probative evidence comes from the May 20, 2017 MRI results and Dr. Provenza's letter dated January 25, 2018.  (doc. 18 at 29-30.)  The MRI showed postoperative changes related to her previous anterior fusion surgery at the L3-L4 and L4-L5 interspaces, no site of central canal stenosis or descending nerve root extrinsic compression, bilateral neural foraminal narrowing at the L3-L4 and L4-L5 levels, and mild to moderate facet joint primary osteoarthritis.  (doc. 13-1 at 92-93.)  It was also noted that her bilateral neural foraminal narrowing could be associated extrinsic compression upon the exiting left L3 and L4 nerve roots.  (*Id*. at 92.) Dr. Provenza's letter stated that Plaintiff was recovering from surgical lumbar decompression surgery, which would prevent her from sitting and standing for periods of time.  (*Id*. at 14.)  Plaintiff also points to a treatment record from August 17, 2017, in which it was noted that she would undergo another back surgery.  (doc. 18 at 31; doc. 13-1 at 30.)   The MRI, letter, and treatment record post-date the ALJ's decision, however, and they do not state whether they cover the period considered in the ALJ's decision.  (*See id*. at 14, 30, 92-93.)  At most, these records are evidence of subsequent deterioration of a previously non-disabling condition.  "Remand is not appropriate 'solely for the consideration of evidence of a subsequent deterioration of what was correctly held to be a non-disabling condition.'"  *Hamilton-Provost v. Colvin*, 605 F. App'x 233, 239 (5th Cir. 2015) (quoting *Johnson*, 767 F.2d at 183 (noting that "subsequent deterioration, however, may form the basis for a new claim")).

Because the new evidence did not dilute the record to the extent that the ALJ's decision became insufficiently supported, was not inconsistent with the ALJ's finding that Plaintiff could perform jobs that existed in significant numbers in the economy, and was at most evidence of subsequent deterioration of a previously non-disabling condition, remand is not appropriate on this

ground. *See Pope v. Colvin*, No. 4:13-CV-473-Y, 2014 WL 1724766, at *5 (N.D. Tex. May 1, 2014) (finding that the new evidence showing a new diagnosis of macular edema did not dilute the record when there was no evidence that such impairment impacted the claimant's ability to work); *see also Morton*, 2011 WL 2455566, at *7 (stating that if, "in light of the new evidence, the [ALJ's] findings are still supported by substantial evidence," the Court must affirm the Commissioner's decision.).

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 7th day of May, 2019.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE